## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**JANICE GRAVES,**

      **Plaintiff,**      :

           **Case No. 2:18-cv-682**

    **v.**           **Judge Sarah D. Morrison**

           **Magistrate Judge Kimberly A.**
           **Jolson**

**KEPHACO CORPORATION,**
*et al.,*            :

      **Defendants.**

## OPINION AND ORDER

Currently pending before the Court is Defendants Kephaco Corporation and Robert Robart's Motion for Summary Judgment. (Mot. for Summ. J., ECF Nos. 14, together with Mem. in Supp. of Summ. J., ECF No. 14-1.)  Plaintiff responded (Resp., ECF No. 17), and Defendants replied (Reply, ECF No. 18). Accordingly, this matter is ripe for review. For the reasons stated herein, Defendants' Motion for Summary Judgment is **GRANTED**.

## I.    BACKGROUND

Plaintiff Janice Graves is an African American woman who was employed by Defendant Kephaco Corporation d/b/a American Marble Industries ("AMI") as an outside sales representative from July 25, 2016, until June 8, 2017. (Pl. Personnel File, ECF No. 17-3 at PAGEID # 368–69.)  Ms. Graves commenced this action on July 12, 2018, alleging eight claims against both Defendants based on: 1) race discrimination, in violation of 42 U.S.C. § 2000e, *et seq.* and Ohio Rev. Code

§ 4112.02(A), *et seq*.; 2) sex discrimination, in violation of 42 U.S.C. § 2000e, *et seq.*

and Ohio Rev. Code § 4112.02(A), *et seq*.; 3) retaliation, in violation of Ohio Rev.

Code § 4112.02(I); 4) wrongful termination on the basis of race and sex; and

5) intentional infliction of emotional distress. (Compl., ECF No. 1.)

### A.    Defendants AMI and Robart

Defendant AMI is an Ohio corporation that manufactures and fabricates

cultured marble, solid surfacing, and natural stone for the kitchen and bath

industry. (Robart Dep. 17:2–14, ECF No. 17-2.) AMI was founded by John Stoffer

(now the company's CEO). (S. Stoffer Dep. 13:9, ECF No. 17-1; J. Stoffer Aff. ¶ 1,

ECF No. 18-1.) John's son, Steve Stoffer, serves as AMI's President. (S. Stoffer Aff.

¶ 1, ECF No. 14-2.) Defendant Robert Robart joined AMI in October 1999 as

Director of Sales and Marketing. (Robart Dep. 26:11–19.) He now holds the title of

Vice President, responsible for overseeing marketing and sales and for servicing a

portion of AMI's customer base. (*Id*. 26:10, 29:7–11.) At the time of filing, AMI had

annual revenues of approximately $6,000,000. (*Id*. 87-3.)

AMI sells its products primarily through building and plumbing supply

wholesale dealers. (*Id*. 33:2–9.) With limited exception, the company does not sell

directly to contractors, builders, or homeowners. (*Id*.; Pl. Dep. 47:10–24, ECF No.

13.) Instead, contractors and builders who are interested in using AMI products

purchase them through a dealer. (Robart Dep. 33:10–13.) AMI sales representatives

are paid a base salary, as opposed to commission, in part because the company does

not sell directly to the end user. (*Id*. 64:11–23.) As a result, for an AMI sales

representative to generate "new" business, they could either (1) enlist a new wholesale dealer, or (2) facilitate sales to a new builder/contractor by working with and through a dealer already selling AMI wares. (*Id*. 34:9–35:24.)

### B.    AMI's Hiring of Ms. Graves

Immediately prior to working for AMI, Ms. Graves was employed by On-Hand Adhesives as a sales account manager. (Pl. Dep. 16:21–25; 39:24–25.) Ms. Graves became acquainted when she cold called AMI, and "sold them chemical mold release for their manufacturing plant." (*Id*. 39:25–40:2.) During this sales call, she spoke with Steve Stoffer. (*Id*. 40:11–15.) Steve Stoffer similarly recalls that he first met Ms. Graves when "[s]he was working for On-Hand Adhesives," and she sold AMI a mold release product. (S. Stoffer Dep. 21:4–7.)

Steve Stoffer submits that Ms. Graves first approached him about working for AMI approximately six months after their initial meeting. (*Id*. 21:7–10.) He states that Ms. Graves contacted him about working for AMI because she was tired of the amount of travelling that she was required to do for On-Hand Adhesives and she wanted to work more locally. (*Id*. 21:10–14.) Steve Stoffer testified that Ms. Graves told him that she could substantially boost AMI's Columbus area sales:

> Q     So there was some testimony about a $500,000 in new business goal. Tell me about that. Did she set that for herself?
>
> A     Yes. She set that for herself. She told me she worked for a pharmaceutical down in Georgia and she doubled her sales to 500,000 and she could do that for me. And she was very good – she sold herself very well, had me convinced, you know.
>
> Q     Did she have a plan of how she was going to bring in these new sales?

> A      She said she had some contractors she knew and she had a good
> relationship with them and she thought she could get them. . . . She
> didn't say any specific names but we definitely need a person down there
> to help Andy with our existing. So that's– it seemed like a great fit. . . .

(S. Stoffer Dep. 22:1–18.) Robart testified that Ms. Graves assured Steve Stoffer

that she would bring in $500,000 in "completely new sales" in three months. (Robart

Dep. 31:15–32:13.) Steve Stoffer and Robart both acknowledge, however, that Ms.

Graves' alleged $500,000 sales goal was neither in writing nor a condition of her

employment. (S. Stoffer Dep. 22:25–23:5; Robart Dep. 119:10–13.)

Ms. Graves recalls her initial interactions with AMI differently. Ms. Graves

maintains that she did not approach Steve Stoffer about working for AMI but that it

was a "joint communication" between them. (Pl. Dep. 42:10–21.) Ms. Graves also

disputes that she promised to generate a certain amount of revenue:

> Q.      And at some point during these discussions did you tell either
> Steve or John [Stoffer] that you could increase – that you could generate
> $500,000 worth of sales in six months?
>
> A.      No, I did not.
>
> Q.      You never say [sic] that.
>
> A.      No, I did not.
>
> Q.      Did you say anything close to that?
>
> A.      I would never say that. As a 20-year sales professional I would
> never tell anyone what I could do before I knew exactly what the
> application could do and the marketplace.
>
> * * *
>
> Q.      My question is very simple, Miss Graves: Did you ever tell Steve
> or John [Stoffer] or anybody from AMI prior to being hired that you could
> generate X amount of dollars of new business?

4

A.      No, sir. No.

(*Id.* 44:19–45:5, 46:2–6.)

Ms. Graves' initial discussions about joining AMI were solely with Steve Stoffer, though she eventually met with both John and Steve Stoffer for a formal interview. (*Id.* 43:11–19.) Steve Stoffer hired Ms. Graves as the AMI sales representative for the Columbus area. (S. Stoffer Dep. 23:16–18.)

Ms. Graves began her job at AMI on July 25, 2016, at an annual salary of $55,000. (Pl. Personnel File.) Ms. Graves was also given a car allowance of $350 per month (plus fuel), a laptop and health benefits.[1] (*Id.*; S. Stoffer Dep. 15:11–12; Robart Dep. 70:16–22.) Ms. Graves was the first and only African American sales representative to be hired by AMI. (S. Stoffer Dep. 17:10–12.)

### C.      Ms. Graves' Job Responsibilities and Training

An AMI sales representative is expected to "maintain the accounts that you have. That's case number one. Because if you lose your accounts, you're not doing anything. So maintain the accounts you have and then grow ones as you can, grow new accounts." (Robart Dep. 41:10–14.)

Before Ms. Graves joined AMI, there was no sales representative who exclusively served the Columbus market. (*See* Jackson Aff. ¶¶ 5–6, ECF No. 14-3.) Rather, Andrew Jackson served that market and the rest of Ohio. (*Id.*) Jackson is a

---

[1] The Court notes an inconsistency between the parties' motion papers and the record evidence with respect to the amount of the monthly car allowance. (*Compare* Reply at 2 ($550 monthly car allowance) *with* Robart Dep. 70:16–22 ($350 monthly car allowance, based on review of Exh. C at ECF No. 17-3, PAGEID # 371).)  The Court further notes that the parties provide no information about the cost—to AMI or to Ms. Graves—of the group health insurance benefit.

white male employed by AMI for over ten years. (*Id*. at ¶ 3.)

Robart and Steve Stoffer were Ms. Graves' supervisors at AMI. (Pl. Personnel File.) Because he had been the sales representative for central Ohio, Jackson was asked to train Ms. Graves. (Jackson Aff. ¶¶ 4–5.) Jackson "spent quite a bit of time with Ms. Graves attempting to prepare her for the position" and he "spent a minimum of [twelve] sales presentations with [AMI's] existing customer base." (*Id*. ¶ 6.) Further, "[a]side from field training, [Jackson] spent time in our home office training her at the beginning of her employment" and he spoke with her "at least three times a week on the phone throughout her employment." (*Id*.¶ 7.)

### D.    Ms. Graves' Sales at AMI

Robart, Jackson, and Steve Stoffer submit that Ms. Graves struggled after the introductory period. Jackson stated that Ms. Graves "was unable to grasp the basic knowledge required to sell [AMI's] products" and "was unable to understand the basic concepts of the product line of AMI and what it took to price out a quote." (*Id*. ¶¶ 8, 10.) These are concepts that Jackson "learned within a month or two of [his] hire at AMI." (*Id*. ¶ 11.) Yet, after working for AMI for eleven months, Ms. Graves "would ask [Jackson] basic questions and continue to ask the same questions [that he] had previously answered for her." (*Id*. ¶ 12.) Eventually, Jackson approached Robart and Steve Stoffer with concerns about Ms. Graves' "sales style," because "[s]he did most of the talking and did not listen to what the potential customers were saying." (*Id*. ¶ 13.) In one instance, Jackson had to "take over" Ms. Graves' presentation because she was unable to answer the customers' questions.

(*Id.* ¶ 14; *see also* S. Stoffer Dep. 26:10–17.)  Another issue was Ms. Graves'

penchant to give potential customers verbal quotes when AMI's practice—and the

industry standard—was "to do written quotes so there was no misunderstanding."

(Jackson Aff. ¶ 15.)

Robart testified about conversations he and Jackson had following Ms.

Graves' training:

> After the first couple trainings [Jackson] came to me and said she's not
> getting it.  She's not – the couple times she got up and actually started
> to speak, he had to stop her because she wasn't explaining our product
> correctly, the process correctly, and I told him we'll give it a few more
> times.
>
> . . . [A]fter the seventh time – the seventh meeting, sales – whatever you
> want to call it, sales meeting, she was supposed to do it on her own,
> completely on her own.  And he called me after it was over – because I
> told him to, and he said it was not good.  He said he had to get up about
> 10 minutes in and take it over.

(Robart Dep. 43:11–25.) When asked to specify what problems Ms. Graves was

having, Robart answered that, even after several months of working at AMI and

touring the company's factory multiple times, Ms. Graves did not know AMI's

product and "she didn't learn." (*Id.* 44:3–19.)

Robart also testified that he gave Ms. Graves written materials to assist her

with learning about the products she was selling. (*Id.* 44:20–24.) After Ms. Graves

had been at AMI for five or six months, Robart asked her to explain cultured

marble; Ms. Graves was unable to do so, leading Robart to determine that "if you're

not going to bother to learn it, then I can't have you continue to sell it." (*Id.* 45:22–

46:5.)

Steve Stoffer testified that he, too, had issues with Ms. Graves and that "she did not perform up to [AMI's] expectations." (S. Stoffer Aff. ¶ 8.) "[S]he had difficulty grasping [AMI's] product line and writing up quotes." (*Id.* ¶ 9.) In addition, both Robart and Jackson informed Steve Stoffer that some of Ms. Graves' customers were asking to work with Jackson instead. (S. Stoffer Dep. 10:2–5, 9–11.) "After several months of no increased sales in the Columbus market[,]" he scheduled a meeting with Ms. Graves "to discuss her difficulties." (S. Stoffer Aff. ¶ 10.)

Ms. Graves, however, asserts that she maintained the Columbus accounts and acquired new customers. In support of this assertion, Ms. Graves relies on AMI's Columbus area sales records for 2014 through June 2017:

| Vendor | 2014 | 2015 | 2016 | 2017 (Jan-June) |
|---|---|---|---|---|
| **AMI Columbus Area Sales** | | | | |
| **AMI Established Accounts** | | | | |
| Carr Supply | 0 | 3,848.52 | 45,142.96 | 26,802.53 |
| Dave Fox Remodeling | 0 | 671 | 0 | 0 |
| Easy Fit | 3,600.95 | 1,296.50 | 0 | 2,350.08 |
| Karshner Sales | 12,722.43 | 19,925.24 | 13,561.51 | 9,659.21 |
| Robertson Supply - Columbus | 3,469.33 | 289.5 | 890.99 | 2,900.44 |
| Robertson Supply - Lima | 1,532.88 | 0.00 | 1,164.81 | 1,209.30 |
| Westwater Supply | 5,313.83 | 6,289.91 | 10,709.55 | 4,718.23 |
| Winnelson | 2,130.67 | 12,628.22 | 13,234.49 | 4,282.25 |
| Worly Plumbing | 113,455.92 | 118,291.70 | 111,261.29 | 89,934.87 |
| **Graves Generated Accounts** | | | | |
| Bathworks | 0 | 0 | 0 | 0 |
| Lumberworks | 0 | 0 | 894.53 | 292.14 |
| **Total Columbus Area Sales** | 142,226.01 | 163,240.59 | 196,860.13 | 142,149.05 |

(AMI Sales Rec. 2014–June 2017, ECF No. 13-1, PAGEID # 111.) The sales record

reflects that Ms. Graves brought in two new accounts: Bathworks and Lumberworks. (*Id.*) During Ms. Graves' employment, Bathworks generated $0 in sales and Lumberworks generated $1,186.67. (*Id.*) The Columbus area sales increased by $33,619.54 from 2015 to 2016, and appear to have been on track to increase more in 2017. (*Id.*)

Ms. Graves contacted potential customers in an attempt to bring in new business. Specifically, Ms. Graves met with the homebuilder Fischer Homes. (Pl. Dep. 49:4–50:1.) However, AMI leadership—including Susan Kolleth (AMI's Corporate Secretary and Office Manager), Steve Stoffer, and Robart—were not enthusiastic about this potential client. (*Id.*) Other potential clients that Ms. Graves spoke with included Floor & Décor, Blazek Hutchinson Builders, Choice Hotels, Woda Cooper Companies, and The Ohio State University. (Apr. 14, 2017 Floor & Décor Email, ECF No. 17-3, PAGEID # 375; Apr. 18, 2017 Floor & Décor Email, ECF No. 17-3, PAGEID # 376; June 5, 2017 Worly Email, ECF No. 17-3, PAGEID # 386; Pl Dep. 96:13–19.)

Ms. Graves also represents that she had good relationships with her existing customers. In support of this, Ms. Graves points to customer emails that praise her:

> 1) An email dated February 1, 2017, from Carr Supply: "We look forward in having you here with your sales experience and professionalism. We couldn't see you not being part of our team and as a partner in the coming years." (Feb. 1, 2017 Carr Email, ECF No. 17-3, PAGEID # 373.)

2) An email dated March 22, 2017, from Carr Supply: "Janice has been a great addition to AMI. She is very attentive, has great follow up skills and brings a sense of fashion to the cultured marble industry!!" (Mar. 22, 2017 Carr Email, ECF No. 17-3, PAGEID # 381.)

3) An email dated March 24, 2017, from Worly Plumbing Supply: "We at Worly would like to commend you [Ms. Graves] for all the hard work and efforts you've provide [sic] with our sales and marketing department. We Could Not Have Sustained with A.M.I. without your leadership and your commitment in achieving our sales goals!" (Mar. 24, 2017 Worly Email, ECF No. 17-3, PAGEID # 383.)

Ms. Graves submits that her proficiency is evidenced by a lack of any written performance improvement plan or written negative performance reviews. (S. Stoffer Dep. 27:7–9; Robart Dep. 45:11–13, 49:21–23.)

**E.    Ms. Graves' Problems with Robart**

Soon after she started with AMI, Ms. Graves began to have problems with Robart. Ms. Graves admits that she needed additional training on the new Tyvarian product and that she frequently called both Steve Stoffer and Robart with questions. (Pl. Dep. 64:22–65:7; S. Stoffer Dep. 42:11–43:11; Robart Dep. 100:2–9.) However, Steve Stoffer and Robart often redirected her questions to Jackson or ignored her phone calls. (S. Stoffer Dep. 43:6–11; Robart Dep. 100:6–9.)

Ms. Graves asserts that Robart's behavior amounted to more than mere

10

avoidance of her calls and submits the following to support this assertion:

1) Robart often ignored her, failed to speak to her, avoided making eye contact with her, rolled his eyes at her, and sometimes refused to shake her hand. (Pl. Dep. 71:16–72:19.)

2) Ms. Graves overheard Robart telling someone that "Steve Stoffer and [her] had a relationship or/and Steve Stoffer liked [her] and there was a personal relationship involved." (*Id.* 71:4–8.)

3) During a tour of the AMI facility with a potential client in December 2016, the potential client told Ms. Graves: "Janice, I'm thinking it's probably hard for a woman to work in this business, being the only woman." Robart then leaned over and told Ms. Graves, "I don't think it's a woman thing, I think it's more of a black woman thing." Ms. Graves is unsure whether the potential client or anyone else heard this comment. (*Id.* 73:18–74:25.)

4) In April 2017, Ms. Graves and Robart led potential clients on a tour of the AMI facility. During this tour, Ms. Graves asked, "Can we do business based on what you're seeing here and based on what we have to offer and based on your needs with the new upcoming hotel?" The potential clients answered affirmatively. After the potential clients left, Ms. Graves overheard Robart telling other AMI employees "She's fucking crazy.  She's not getting that deal." When she and Robart were walking out, Ms. Graves confronted

Robart and he told her "I'm just joking around" or "I'm just fucking around." (*Id.* 77:9–79:1, 79:15–80:4.)

Ms. Graves submits that she reported Robart's actions to Steve Stoffer and Kolleth—who acted as the '*de facto*' human resources representative for AMI—"countless" times. (*Id.* 76:2–14.) But when asked to specify one instance that she complained, Ms. Graves was unable to give a specific date. (*Id.* 76:16–21.)

Ms. Graves further avers that Robart's treatment of her culminated in her termination. When asked if Robart engaged in any other behavior that Ms. Graves believed to be discriminatory, she testified that Robart retaliated against her because of conversations she had with John and Steve Stoffer about problems with factory operations which led to issues generating Columbus area sales. (*Id.* 82:23–83:8.) Ms. Graves was asked to explain how Robart retaliated against her, and she testified "[b]y firing me" before clarifying that John Stoffer fired her "but it was along with, from my understanding, what [Robart] had told John." (*Id.* 83:9–13.) She believes this to be true because, when she asked John Stoffer to explain why she was being fired, he responded "I can't. I can't tell you for sure why, I just know we can't sustain the market." (*Id.* 84:7–14.)

### F. Ms. Graves' Evaluation Meetings and Termination

Ms. Graves met with Steve Stoffer, Robart, and Kolleth on March 20, 2017. The parties describe what occurred at this meeting differently. Kolleth, in her contemporaneous notes, wrote that they "went over [Ms. Graves'] expenses [and] sales from start date to current date. [Ms. Graves] was given [two months] to

12

generate $25,000.00 in new sales or position would be terminated." (Kolleth Notes.
ECF No. 13-1, PAGEID # 113.) In her affidavit, Kolleth swore that Ms. Graves "was
informed very clearly on March 20 that if she did not improve her sales numbers,
her employment would be terminated." (Kolleth Aff. ¶ 10, ECF No. 14-4.)

Steve Stoffer similarly describes this meeting and testified that Robart "gave
her a number that she had to hit. I don't recall the number, I think it was [$]25,000
to start with, to see if you can get that. Didn't happen." (S. Stoffer Dep. 30:12–15.)
Steve Stoffer gave conflicting accounts as to whether Ms. Graves would be
terminated if she failed to meet her sales goal. In his affidavit, he stated that he
told Ms. Graves "that she needed to call on potential new customers and have
$25,000 of sales within the next two months or she would be terminated." (S. Stoffer
Aff. ¶ 11.) Yet, during his deposition, Steve Stoffer did not recall whether he said
that Ms. Graves would be let go if she failed to meet this goal.  (S. Stoffer Dep.
30:16–23.) Regardless, Ms. Graves never hit this target. (*Id.* 30:24–31:1.)

Robart similarly recalls that, during the March 20 meeting, Ms. Graves was
informed that her sales performance was not up to the expected standard. (Robart
Dep. 110:7–17.) He says that Ms. Graves was argumentative and that she told him
that he "didn't know what [he] was doing and not giving her space." (*Id.* 110:22–23.)
In response, Robart stated that AMI had given her samples and displays to assist
her and that they "did everything [they] could to help her." (*Id.* 110:25–111:7.) Ms.
Graves was offered further assistance during this meeting and informed that she
needed to attain either $25,000 in new sales or identify ten new targets to remain in

13

AMI's employ. (*See id.* 112:7–12, 55:6–17.) Robart states that Ms. Graves was instructed to simply identify ten new targets—not to bring in ten new customers—and Ms. Graves failed to do so. (*Id.* 55:19–25.) Rather, Ms. Graves gave Robart "a list that she Googled of 100 builders[,]" Robart told her that this was insufficient because she would need to "find out if a dealer is already dealing with [those companies]." (*Id.* 56:12–23.)

According to Ms. Graves, at no point during this meeting did they discuss her production or that she had not produced any new customer accounts. (*Id.* 91:20–92:3.) Rather, she says that, during this meeting, Robart shouted at her that "[she] didn't know what the fuck [she] was doing, didn't know anything about manufacturing, [and] didn't know anything about marble." (Pl. Dep. 91:6–10.) Steve Stoffer watched Robart's display in shock and said nothing. (*Id.* 91:12–17.) After Robart shouted at her, Ms. Graves "ended the meeting" and stated that John Stoffer needed to be present for the discussion to continue. (*Id.* 91:14–19.) Ms. Graves denies that she was told that she had to meet a certain goal within two months or face termination. (*Id.* 86:11–17.)

Ms. Graves, Kolleth, Steve Stoffer, and Robart met again on March 28, 2017.[2] The parties also recall this meeting differently. Ms. Graves testified as follows:

> Q.     And were you told at [the March 28, 2017] meeting that you had to have ten new clients?
>
> A.     No. What I was told at that meeting when I talked to [John] Stoffer was that we went over the problems that was in that particular

---

[2] There is conflicting information as to whether John Stoffer attended the March 28, 2017 meeting. (*Compare* S. Stoffer Dep. 13:2–5 *with see also* S. Stoffer Dep. 26:10–17; Robart Dep. 112: 22–25.)

> plant, we went over many emails with customers' feedback on what was going on in the Columbus market and why they were not being able to not only retain customers but to also grow in their revenue.
>
> I showed them many emails and feedbacks from the customer, and in that meeting at that time Rob Robart stated to me that, "Okay, I'm sorry. I misjudged you." And we ended that meeting saying that should be increased, sales, but I said, "What I need from you is for you to clean up the manufacturing plant."

(Pl. Dep. 87:25–88:15.) When asked whether they discussed her job performance during this meeting, Ms. Graves testified that they discussed why AMI's revenue was down in the Columbus market and she informed them that there were issues with the lead times, scheduling, installation, and the material itself. Ms. Graves described the conversation as "a game plan" where they "discussed the productivity more so than anything." (*Id.* 92:7–14.) According to Ms. Graves, several plant managers attended the March 28, 2017 meeting and they discussed the problems with the plant. (*Id.* 88:16–23.)

According to Kolleth's notes from the March 28, 2017 meeting, another meeting was to occur on June 5, 2017, when Ms. Graves was "to have [ten] new clients called upon." (Kolleth Notes.)

At his deposition, Steve Stoffer recalled that the March 28 meeting was similar to the one on March 20. (S. Stoffer Dep. 39:14–18.) Following these meetings, Ms. Graves tried to meet with Steve Stoffer to show him emails that she had collected from current customers instead of increasing sales, so he "reiterated that she needed to increase her sales." (S. Stoffer Aff. ¶ 12.)

John and Steve Stoffer ultimately determined that Ms. Graves' sales could

15

not sustain her salary and they terminated her employment. (*Id*. ¶ 13.) Robart was not involved in this decision. (*Id*. ¶ 14.) In his sworn affidavit, John Stoffer submits:

> 2.      I made the decision to terminate Janice Graves on June 7, 2017.
>
> . . .
>
> 4.      I terminated Graves as her sales did not support her salary and expenses to AMI.
>
> . . .
>
> 6.      Typically[,] AMI only has Rob Robart and one other outside sales person, currently Andrew Jackson. The addition of a second outside sales associate required additional sales to support the position which did not occur.

(J. Stoffer Aff. ¶¶ 2–6.)

John Stoffer called and fired Ms. Graves on June 7, 2017. She received a letter dated June 8, 2017, confirming that her employment at AMI was terminated. (Termination Letter, ECF No. 17-3, PAGEID #390–91.) That letter informed her that she was "let go from [her] position for cost cutting measures." (*Id*.) The letter further stated:

> 5. Andy [Jackson] and Rob [Robart] will be servicing the Columbus area as they did before you were hired.
>
> 6. Just to set the record straight, we did have a review of your performance in the meeting[s] held on March 20, 2017 and March 28, 2017.
>
> 7. Again, I [John Stoffer] want to apologize for not anticipating what the real cost of bringing on a third salesperson would be and for not providing, in some cases, the adequate back up.

(*Id*.) After Ms. Graves' termination, her job duties were taken over by Jackson. (Jackson Aff. ¶ 17.)

16

### G.    Procedural Posture

Defendants have now moved for summary judgment on all claims. (Mot. for Summ. J.; Mem. in Supp. of Summ. J.) Ms. Graves opposes summary judgment on her first seven claims; she did not address Defendants' arguments on her intentional infliction of emotional distress claim. (Resp.) Defendants filed a reply in support of their motion. (Reply.) This matter is fully briefed and ripe for review.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The Court may therefore grant a motion for summary judgment if the nonmoving party, who has the burden of proof at trial, fails to make a showing sufficient to establish the existence of an element that is essential to the party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact." *Id.* at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)). A genuine issue of material fact exists "if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party). Consequently, "[t]he central issue is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234–35 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251–52).

## III.  ANALYSIS

### A.  Discrimination Claims

Ms. Graves brings race and sex discrimination claims under both state and federal law. The United States Code section governing employment discrimination states, in pertinent part:

> It shall be an unlawful employment practice for an employer–
>
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. . . .

42 U.S.C. § 2000e-2(1). The relevant portion of Ohio's employment discrimination statute states:

> It shall be an unlawful discriminatory practice:
>
> (A) For any employer, because of the race, color, religion, sex, military status, national origin, disability, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to

18

employment.

Ohio Rev. Code § 4112.02(A).

"[F]ederal case law interpreting Title VII of the Civil Rights Act of 1964, Section 2000e *et seq.*, Title 42, U.S. Code, is generally applicable to cases involving alleged violations of R.C. Chapter 4112." *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 421 N.E.2d 128, 131 (Ohio 1981); *see also Noble v. Brink Int'l, Inc.*, 391 F.3d 715, 720 (6th Cir. 2004) (stating same). Accordingly, the Court will analyze Ms. Graves' federal and state law claims of discrimination together.

To establish claims of race or sex discrimination, a party can rely on either direct or circumstantial evidence. *See Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 561 (6th Cir. 2004) (citing *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997)). Direct evidence is "evidence that proves the existence of a fact without requiring any inferences." *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir. 2004) (citations omitted). Here, Ms. Graves has not proffered direct evidence of discrimination.

"Where a plaintiff submits only circumstantial evidence of discrimination, [the Court] analyze[s] the claim using the familiar *McDonnell-Douglas*-burden-shifting framework." *Romano v. Hudson City Sch. Dist.*, 772 F. App'x 258, 264–65 (6th Cir. 2019) (citing *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 283 (6th Cir. 2012) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973))). The plaintiff must first establish a *prima facie* case of discrimination. *McDonnell Douglas*, 411

19

U.S. at 802. If she does so, the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions. *Id.* If the defendant satisfies its burden, the plaintiff then has the obligation to prove that the proffered reason is pretextual. *Id.* at 804.

To establish a *prima facie* case of discrimination, a plaintiff must establish that: (1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) she was qualified for the position; and (4) similarly situated non-protected employees were treated more favorably or that she was replaced with an individual outside of the protected class. *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 776 (6th Cir. 2016). "The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2000).

Defendants challenge whether Ms. Graves has sufficiently established the third and fourth elements of her *prima facie* case. However, the Court need not address these arguments because, even assuming *arguendo* that she can establish her *prima facie* case, Ms. Graves has failed to proffer evidence that Defendants' stated reason for terminating her employment is pretext for discrimination.

Defendants[3] submit that "AMI has set forth a valid business justification for its actions" in that Ms. Graves "failed to perform the duties required by her

_____

[3] While Robart was Ms. Graves' formal supervisor (*see* Pl. Personnel File), Robart did not make the decision to terminate Ms. Graves' employment (*see* J. Stoffer Aff. ¶ 2; S. Stoffer Aff. ¶ 15; *see also* Section III.A.2., *infra*). Nonetheless, the parties do not argue that a different standard or analysis is applicable to Ms. Graves' claims against Robart as compared to AMI. As a result, the Court refers to

position; in short, she did not sell." (Mem. in Supp. of Summ. J., 12.) Or, as John Stoffer put it, "[Ms. Graves'] sales did not support her salary and expenses to AMI." (J. Stoffer Aff. ¶ 4.) Once Defendants proffer a legitimate nondiscriminatory reason for Ms. Grave's termination, the burden shifts back to her to demonstrate that the reason is mere pretext for discrimination.

A plaintiff can establish the pretextual nature of an employer's stated reason for an adverse employment action in three ways: "(1) the reason has no basis in fact, (2) the reasons did not actually motivate the [employment action], or (3) the reason was insufficient to motivate the [employment action]." *Alberty v. Columbus Twp.*, 730 F. App'x 353, 361 (6th Cir. 2018) (citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), *overruled on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009)). "In challenging an employer's action, an employee 'must demonstrate that the employer's reasons (each of them if the reasons independently caused the employer to take the action it did) are not true.'" *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998) (alterations omitted) (quoting *Kariotis v. Navistar Int'l Trans. Corp.*, 131 F.3d 672, 676 (7th Cir. 1997)). "A reason cannot be pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285 (alterations omitted) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)).

---

"Defendants" *in toto* when discussing the legitimate nondiscriminatory reason for Ms. Graves' termination, although Robart was not the decisionmaker when it came to her termination.

Irrespective of the method a plaintiff uses to rebut a defendant's reasons, the plaintiff "always bears the burden of producing sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that the defendant [ ] intentionally discriminated against him." *Id.* (quoting *Clark v. Walgreen Co.*, 424 F. App'x 467, 474 (6th Cir. 2011) (alterations in original). When assessing the evidence provided by the parties, the Court is to be mindful that "[p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" *Parkhurst v. Am. Healthways Servs., LLC*, 700 F. App'x 445, 449 (6th Cir. 2017) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009)).

Ms. Graves argues that Defendants' legitimate nondiscriminatory reason for firing her was pretext because: 1) it has no basis in fact; and 2) it was not the true motivation behind her termination. (Resp. at 15–17.) However, she fails to point the Court to record evidence that creates a genuine issue of material fact on either of these bases.

### 1. Defendants' reason is based in fact

In *Joostberns v. United Parcel Servs., Inc.*, the Sixth Circuit explained that an assertion that the defendant's nondiscriminatory reason for termination is not based in fact "is essentially an attack on the credibility of the employer's proffered reason." 166 F. App'x 783, 791 (6th Cir. 2006) (citing *Manzer*, 29 F.3d at 1084). To demonstrate that a defendant's reason is not based in fact, the plaintiff must show "that the employer did not actually have cause to take adverse action against the

22

employee based on its proffered reason, and thus, that the proffered reason is pretextual." *Id.* (citing *Manzer*, 29 F.3d at 1084).

Ms. Graves argues that Defendants' proffered reason for firing her (that Ms. Graves' sales were insufficient to support the cost of the position created for her) was not based in fact because "the [Columbus area sales] increased from $163,240.59 in 2015 to $196,860.13 in 2016, while sales in 2017 (through June) were $142,149.05, well on-track to exceed the prior three years' sales." (Resp. at 15.) This argument is incomplete and, therefore, unconvincing. It is foundational in business that profit equals revenues less expenses. And while Ms. Graves points to evidence indicating that AMI did experience increased revenues during her tenure, she ignores that the business also incurred expenses.

Conducting a very simple analysis: Ms. Graves' total compensation from AMI included a $55,000 annual salary, $350 monthly car allowance, and group health insurance. AMI also covered Ms. Graves' incidental expenses, such as travel accommodations and gas, and provided her with a laptop and sales aids, including samples and displays. Even assuming, *arguendo*, that Ms. Graves (who was hired nearly eight months into the year) is responsible for the entire $33,619 increase in year-over-year sales for 2016, her base salary and car allowance alone left little room for profit, totaling $26,184 for 2016.[4] And while AMI's 2017 Columbus area sales as of June appeared on-track to exceed the previous years, Ms. Graves does not provide evidence that the increase in revenues is in excess of the associated

---

[4] A $55,000 annual salary plus $350 monthly car allowance equals $1,138.46 per week. July 25 began the thirtieth week of 2016, leaving 23 compensable weeks in the year.

increase in expenses—let alone that any excess is so substantial as to undermine the credibility of AMI's stated reason for terminating her employment. It may be that, given more time, Ms. Graves would have further increased AMI's Columbus area sales—but the law does not require AMI to wait. *See Hartsel v. Keys*, 87 F.3d 795, 801 (6th Cir. 1996) (explaining that "[t]he law does not require employers to make perfect decisions, nor forbid them from making decisions that others may disagree with. Rather, employers may not hire, fire, or promote for impermissible, discriminatory reasons."). In this case, the sales figures as of the time of Mr. Graves' termination do not contradict Defendants' assertion that Ms. Graves was terminated because her sales did not support her continued employment.

Furthermore, it is undisputed that after Ms. Graves was fired, her former duties were reabsorbed by Andrew Jackson, the same AMI sales representative who serviced the Columbus area prior to Ms. Graves' hire. This fact further supports Defendants' assertion that Ms. Graves' position was eliminated because the sales would not support a salesperson dedicated solely to the Columbus market.

Finally, while Ms. Graves argues that the Termination Letter did not explicitly say she was terminated for lack of sales or her performance (Resp. at 10), the letter did refer to cost cutting measures. John Stoffer's communications with Ms. Graves with regard to her termination were entirely consistent: when he verbally terminated her, he said that "he couldn't sustain the marketplace in the Columbus area." Then, in the Termination Letter, he explained that she was being terminated "because of cost-cutting measures." John Stoffer even apologized that

24

they had not anticipated "the real cost of bringing on a third salesperson." A logical reading of the Termination Letter leads to one conclusion: the cost to AMI of employing a dedicated Columbus area sales representative was greater than any increase in sales attributable to that representative. This reading is confirmed by John Stoffer's affidavit (J. Stoffer Aff. ¶ 4) and Steve Stoffer's deposition testimony (S. Stoffer Dep. 25:14–16, 29:1–2) and affidavit (S. Stoffer Aff. ¶ 13). Thus, Ms. Graves has failed to create a genuine dispute that the stated reason for her termination was not the real reason.

### 2. Defendants' reason actually motivated Ms. Graves' termination

When arguing that a defendant's reason did not truly motivate the decision, a plaintiff "does not attack the credibility of the employer's reason. Rather, [she] admits that the reason could motivate the employer but argues that the illegal reason is more likely than the proffered reason to have motivated the employer." *Joostberns*, 166 F. App'x at 791 (citing *Manzer*, 29 F.3d at 1084) (internal citations omitted). This involves more than what is demanded to establish the *prima facie* case of discrimination and requires additional evidence. *Id.* (citing *Manzer*, 29 F.3d at 1084). "A plaintiff must offer evidence sufficient to allow a reasonable juror to find that the employer was motivated by illegal reasons considering both the employer's stated reasons and evidence the employer offers in support of such reasons." *Id.* (citing *Manzer*, 29 F.3d at 1083).

Ms. Graves asserts the following facts demonstrate that Defendants' actual reason for firing her was discriminatory:

25

1) Ms. Graves was the first African American salesperson at AMI;

2) Robart ignored and did not speak to Ms. Graves, even though he was her supervisor;

3) Robart did not make eye contact with Ms. Graves, refused to shake her hand, and rolled his eyes at her;

4) Robart told others that Ms. Graves and Steve Stoffer had a "personal relationship" and that she was hired because of this personal relationship;

5) During a December 2016 facility tour with a potential customer, the potential customer commented: "Janice, I'm thinking it's probably hard for a woman to work in this business being the only woman" to which Robart responded: "I don't think it's a woman thing, I think it's more of a black woman thing";

6) After an April 2017 facility tour with potential customers that orally agreed to do business with AMI, Ms. Graves overheard Robart tell other AMI employees "She's fucking crazy"; and

7) During her March 20, 2017 meeting with Steve Stoffer and Robart, Robart screamed at Ms. Graves stating that "[she] didn't know what the fuck [she] was doing, didn't know anything about manufacturing, didn't know anything about marble."

(Resp. at 17.) Ms. Graves also leans on Robart's testimony that he was involved in making the determination to terminate her employment:

26

Q.    Who was the one that said, "Okay, we've got to get rid of her"?

A.    That would be a determination of Steve, I and John.

Q.    And all three of you made that determination?

A.    Yes. Based on the information we had, yes.

(Resp. at 17; Robart Dep. 36:16–23.) Ms. Graves ultimately acknowledges, however, that "John Stoffer . . . made the final decision to terminate her employment in June 2017." (Resp. at 18 (citation omitted); *see also* Pl. Dep. 83:11–13.)

Defendants counter that the evidence Ms. Graves has proffered is insufficient because there were only "two incidents over 11 months where Robart was 'mean to her.'" (Reply at 4.) Defendants further argue that Robart's actions, as described by Ms. Graves, do not demonstrate that Ms. Graves' race or sex motivated the decision to terminate her. (*Id.*)

The undisputed evidence is that John Stoffer made the final decision to terminate Ms. Graves' employment. Ms. Graves provides neither facts nor analysis indicating that Robart's alleged discriminatory animus actually influenced John Stoffer's decision to terminate her employment. Accordingly, Ms. Graves has failed to meet her burden to demonstrate that Defendants' legitimate nondiscriminatory reason for firing her was pretext for either race or sex discrimination. As such, Defendants' Motion for Summary Judgment on Ms. Graves' state and federal sex and race discrimination claims is **GRANTED**.

27

### B.    Retaliation Claim

Ms. Graves asserts her retaliation claim only under Ohio law, which

provides:

> It shall be an unlawful discriminatory practice:
>
> * * *
>
> For any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section or because that person made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code.

Ohio Rev. Code § 4112.02(I). Retaliation claims under Ohio law mirror their federal

counterpart. *See Braun v. Ultimate Jetcharters, LLC*, 828 F.3d 501, 510 (6th Cir.

2016) (citing *Baker v. Buschman Co.*, 713 N.E.2d 487, 491 (Ohio Ct. App. 1998)); *see*

*also Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights*

*Comm'n*, 421 N.E.2d 128, 131 (Ohio 1981). Thus, retaliation claims based on

circumstantial evidence are also subject to the *McDonnell Douglas* burden shifting

framework. *Mansfield v. City of Murfreesboro*, 706 F. App'x 231, 236 (6th Cir. 2017).

In other words, if a plaintiff establishes a *prima facie* retaliation case, the burden

shifts to the defendants to provide a legitimate non-retaliatory reason for the

adverse action taken against the plaintiff. The burden then shifts back to the

plaintiff to demonstrate that the defendants' legitimate non-retaliatory reason is

mere pretext. *Id.* (quoting *Evans v. Prof'l Transp., Inc.*, 614 F. App'x 297, 300 (6th

Cir. 2015)).

The Court need not determine whether Ms. Graves established a *prima facie* case of retaliation because she has failed to demonstrate that Defendants' legitimate nonretaliatory reason for terminating her employment was pretext for retaliation. As discussed in detail above, Defendants fired Ms. Graves because her level of sales made it financially untenable for the company to sustain a dedicated salesperson for the Columbus market. Ms. Graves sets forth no new facts or arguments when asserting that Defendants' reason for firing her was pretext for retaliation than those she relied on to assert that Defendants' reason was pretext for discrimination. (Resp. at 20.) Because the Court has already found Ms. Graves' arguments insufficient, further analysis is not required. Defendants' Motion for Summary Judgment on Ms. Graves' state law retaliation claim is **GRANTED**.

### C.    Wrongful Termination Claims

Generally, in Ohio, employees are at-will and can be fired for any non-discriminatory reason. *See Dohme v. Eurand Am., Inc.*, 956 N.E.2d 825, 828–29 (Ohio 2011). However, there is a public policy exception to the at-will employment doctrine. *Id.* at 829. To establish a wrongful termination claim, a plaintiff must demonstrate: 1) that a clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the clarity element); 2) that dismissal under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element); 3) that the plaintiff's dismissal was motivated by conduct related to the public policy (the causation element); and 4) lack of an overriding legitimate business

justification for the dismissal (the overriding justification element). *Collins v. Rizkana*, 652 N.E.2d 653, 657–58 (Ohio 1995). The first two elements are questions of law, while the third and fourth elements are questions of fact. *Id.* at 658.

Defendants submit the same arguments on the insufficiency of Ms. Graves' wrongful termination claims as they put forth on the inadequacy of her discrimination claims. (*See* Mem. in Supp. of Summ. J. at 13.) As discussed *supra*, Ms. Graves has failed to demonstrate that Defendants' legitimate non-discriminatory reason for terminating her employment was mere pretext for discrimination. As such, Ms. Graves has similarly failed to establish the fourth element of her wrongful termination claims.[5] Therefore, the Court **GRANTS** Defendants' Motion for Summary Judgment on Ms. Graves' common law wrongful termination claims.

---

[5] While Defendants failed to address it, Ms. Graves' common law wrongful termination claims are likely superseded by both federal and state statutory sex and race discrimination causes of action. *See Carrasco v. NOAMTC Inc.*, 124 F. App'x 297, 304 (6th Cir. 2004) ("Because Carrasco has a remedy available to him under both Title VII and the [Ohio Civil Rights Act], we find that he cannot have that same claim under Ohio common law."); *Schirmer v. Enerfab, Inc.*, No. 1:04-cv-345, 2006 WL 2612894, at *13–14 (S.D. Ohio Sept. 8, 2006) (finding that a plaintiff is barred from bringing a public policy claim for wrongful discharge where federal statutes provided adequate remedy); *Barton v. Air Express Int'l USA, Inc.*, No. 1:06-cv-1885, 2007 WL 851882, at *2 (N.D. Ohio Mar. 19, 2007) (dismissing public policy claim where plaintiff had an adequate remedy under federal and state law, including Title VII and Ohio Rev. Code § 4112); *Dillbeck v. Huntington Nat'l Bank*, No. 2:03-cv-689, 2005 WL 1266690, at *7 (S.D. Ohio May 26, 2005) (holding that "[t]he statutory remedies that existed under the ADA and O.R.C. § 4112 are adequate to protect society's interest in discouraging employers from engaging in discrimination and further provide sufficient compensation to the victims of such discrimination"); *Kolcun v. Nationwide Ins. Co.*, No. C2-04-cv-1079, 2006 WL 1447299, at *10 (S.D. Ohio May, 24, 2006) (same).

### D. Intentional Infliction of Emotional Distress

Ms. Graves' final claim is one for intentional infliction of emotional distress ("IIED") under Ohio law. The four factors that plaintiff must demonstrate to establish an IIED claim are:

> (1) that the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff;

> (2) that the actor's conduct was so extreme and outrageous as to go beyond all possible bounds of decency and was such that it can be considered as utterly intolerable in a civilized community;

> (3) that the actor's actions were the proximate cause of the plaintiff's psychic injury; and

> (4) that the mental anguish suffered by the plaintiff is serious and of a nature that no reasonable man could be expected to endure it.

*Chisholm v. St. Marys City Sch. Dist. Bd. of Educ.*, 947 F.3d 342, 353 (6th Cir. 2020) (quoting *Burkes v. Stidham*, 668 N.E.2d 982, 989 (Ohio Ct. App. 1995)).

Defendants assert that Ms. Graves failed to satisfy the second and fourth elements, and no reasonable jury could find otherwise. (Mem. in Supp. of Summ. J., 16.) Ms. Graves failed to oppose Defendants' argument. (*See generally* Resp.)

Looking to the unrebutted facts, Defendants are entitled to summary judgment. "Only conduct that is truly outrageous, intolerable, and beyond the bounds of decency is actionable; persons are expected to be hardened to a considerable degree of inconsiderate, annoying, and insulting behavior." *Stewart v. Suarez Corp. Indus.*, No. 5:15-cv-1425, 2015 WL 8272951, at *2 (N.D. Ohio Dec. 8, 2015) (quoting *Petrarca v. Phar-Mor, Inc.*, No. 2000-T-0121, 2001 WL 1117015 (Ohio

Ct. App. Sept. 21, 2001)). Ms. Graves has failed to demonstrate that Defendants engaged in conduct that was extreme and outrageous outside the bounds of the everyday annoyances that society is expected to weather, or that her mental anguish is serious and of a nature that no reasonable person could be expected to endure. Accordingly, Defendants' Motion for Summary Judgment on Ms. Graves' IIED claim is **GRANTED**.

## IV.    CONCLUSION

For the reasons stated herein, Defendants' Motion for Summary Judgment (ECF No. 14) is **GRANTED**.  The Clerk is **DIRECTED** to enter judgment in favor of the Defendants.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**